# In the United States Court of Federal Claims

No. 15-1409C
(Originally Filed: May 3, 2016)
(Re-Filed: May 6, 2016)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MSC INDUSTRIAL DIRECT CO., INC.

       *Plaintiff,*

v.

THE UNITED STATES,

       *Defendant,*

and

W. W. GRAINGER, INC.

       *Defendant-Intervenor.*

Bid Protest; Pre-Award; Corrective Action; Federal Supply Schedule; Blanket Purchase Agreement, FAR 8.405-3; AbilityOne Program

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Joseph P. Hornyak*, McLean, VA, for plaintiff, with whom were *Gregory R. Hallmark*, McLean, VA, and *Denisse S. Velarde-Cubek*, McLean, VA, of counsel.

    *Jeffrey D. Klingman*, Trial Attorney, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, and *Alissa Schrider*, Assistant General Counsel, Personal Property Division, Office of General Counsel, General Services Administration, of counsel.

---

[1] This opinion was originally filed under seal. The parties were directed to confer and propose redactions. The court adopted the parties' suggested redactions, removed the information, and inserted brackets to replace the redacted content. The opinion is now prepared for release.

*Anne B. Perry*, Washington, DC, for intervenor, with whom were *Jonathan S. Aronie*, Washington, DC, *David S. Gallacher*, Washington, DC, and *Matthew W. Turetzky*, Washington, DC, of counsel.

———————

OPINION

———————

BRUGGINK, *Judge*.

This is a post-award protest of a corrective action decision taken by the General Services Administration ("GSA" or "the agency") in response to a Government Accountability Office ("GAO") protest by W.W. Grainger, Inc. ("Grainger") following the award of two blanket purchase agreement ("BPA") modifications to MSC Industrial Direct Co., Inc. ("MSC"). Specifically, MSC protests GSA's decision to (1) terminate the awards of the BPA modifications to MSC under Request for Quotations ("RFQ") No. QS0A-4PL-150014; (2) amend the RFQ to correct an asserted misstatement of a requirement; (3) invite competitors to submit revised quotations; and (4) make a new award decision. Pending are the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC") and intervenor's motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6). The motions are fully briefed, and oral argument was held on April 29, 2016. As announced at the conclusion of oral argument, and for the reasons set out herein, we deny plaintiff's motion and grant defendant's and intervenor's motions for judgment on the administrative record. Intervenor's motion to dismiss is denied as moot.

BACKGROUND

The GSA Office of General Supplies and Services ("GSS") is responsible for acquisition services and comprehensive supply chain management. One of its divisions, Retail Operations, manages GSS's fourth-party logistics ("4PL") solutions program. This program is designed to provide supply solutions to client organizations.

The Federal Supply Schedule ("FSS"), also known as the GSA Schedules Program or the Multiple Award Schedule Program ("MAS"), provides federal agencies with a simplified process for obtaining commonly used commercial supplies and services. GSA schedule contracts require all

2

contractors to publish an "Authorized Federal Supply Schedule Pricelist," which contains all supplies and services offered by a contractor. BPAs may be established under FSS contracts "to fill repetitive needs for supplies or services." FAR 8.405-3(a)(1).

Sometime prior to December 2013, a number of Command Fleet Readiness Centers ("COMFRC") and DLA Aviation Fleet Readiness Centers ("FRC") requested the 4PL program. In order to provide supply services to the FRCs, GSA Retail Operations issued an RFQ on December 9, 2013, for the purpose of establishing multiple BPAs with existing MAS vendors to provide and manage inventory within the FRCs.

On June 16, 2014, GSA established BPAs with four vendors: MSC, Grainger, [   ], and [   ]. All four vendors have contracts pursuant to FSS Schedule 51V, which covers hardware supply needs. The BPAs did not authorize vendors to begin supplying products; instead, they provided that GSA would issue a competitive RFQ and would award two BPA modifications to the vendor(s) whose quotations represented the best value to the government.

The BPAs contemplated that the awardee vendors would establish physical storefronts for the purpose of stocking and managing industrial product inventory for military FRCs. Vendors would also be required to fill in-store "referral" orders of items from the vendor's catalog which were not currently stocked in the store and allow for on-line "referral" ordering. The BPAs provided that "[d]elivery is required no later than 3 calendar days after receipt of order." Administrative Record ("AR") 31. Further, the vendor was to maintain a fill rate for in-store/online referral and web ordering of 95%. AR 43. This rate is "based upon the maximum time interval (in business days) from the issuance of the order to the date that the order is delivered." *Id.*

The modifications required vendors to "ensure that no item which is essentially the same as an AbilityOne item be sold to a Government customer," and to delete "all items, terms and conditions not accepted by the Government, including items Essentially-the-Same ("ETS") as AbilityOne products" from print and electronic catalogs. AR 123-24.[2]

---

[2] The AbilityOne program is authorized by the Javits-Wagner-O'Day Act "to
(continued...)

RFQ QS0A-4PL-150014 was issued in February 2015.[3] Its purpose was to "acquire support for GSA [] end-to-end supply chain management requirements (Issue Points) for the Distribution Centers and Supply Storage Centers" for FRCs in Jacksonville, Florida ("FRCSE"), Oceana and Norfolk, Virginia ("FRCMA"), Cherry Point, North Carolina ("FRCE"), and San Diego, California ("FRCSW"). AR 284. The RFQ contemplated that two BPA modifications would be awarded  one for FRCSE, FRCMA, and FRCE, and a second for FRCSW. The statement of work provided that the BPA holder would supply the line of tools and industrial products for the FRCs' Distribution Centers, Supply Storage locations, Master Tool Room Warehouses, Safety Crib Warehouses, and Facilities Maintenance Warehouses. *Id.* Unlike the BPA, the RFQ did not mention a three-calendar-day delivery requirement for referral orders.

The evaluation was based on price and non-price factors. The non-price factors, in order of importance, were: Specific Technical Expertise-Supply Chain System Capability, Past Performance, and Local and Small Business Utilization Plan. AR 297-98. These factors, when combined, were significantly more important than price. *Id.* For the price evaluation, the RFQ instructed BPA holders to quote prices for 548 commonly purchased items, called the "market basket." AR 296. The evaluation would involve a comparison of each vendor's proposed unit pricing for the market basket items. However, the bidders were not expected to submit price quotations for all 548 items; thus, only the common items submitted would be evaluated. The evaluation would

---

[2](...continued)
increase employment and training opportunities for persons who are blind or have other severe disabilities through Government purchasing of commodities and services from nonprofit agencies employing these persons." 41 C.F.R. § 51-1.3 (2016). This program is administered by the Committee for Purchase from People Who Are Blind or Severely Disabled. The Committee maintains and publishes in the Federal Register a procurement list that includes items which must be procured from "a qualified nonprofit agency for the blind or . . . a qualified nonprofit agency for other severely disabled." 41 U.S.C. § 8503(a)(1) (2012). Federal agencies intending to procure an item on the list must purchase it from a qualified nonprofit agency, if available. § 8504(a).

[3] The RFQ was amended several times during March 2015 prior to the initial submission of proposals.

be "based on offered discount from BPA prices, including the weighted average of the discounts proposed for the three sales volume tiers." AR 111.

Both MSC and Grainger submitted quotations in response to the RFQ on March 11, 2015. MSC's quotation provided that it is able to deliver orders anywhere in the contiguous 48 United States within three *business* days after receipt of order. Grainger's quotation stated that it can "provide 24-48 hour shipment times on most referral orders" and that "items requested for pick-up that are not immediately available at the On-Site location will be shipped for next day pick-up from the supporting [distribution center]." AR 459, 468.

The quotations were evaluated during March and April 2015. Grainger and MSC were given the same ratings for all of the non-price factors. AR 950-60. During the price evaluation, it was determined that MSC's price was approximately 23% lower than Grainger's price. AR 961-66. The contracting officer therefore determined that MSC's quotation represented the best value to the government. AR 966. On May 4, 2015, GSA awarded the BPA modifications to MSC. The contracting officer subsequently notified Grainger of the award decision and informed Grainger that MSC's price was approximately 23% lower than Grainger's. AR 972.

On May 13, 2015, Grainger filed a protest at GAO, challenging GSA's award of the BPA modifications to MSC on grounds not relevant to the current protest. On June 16, 2015, Grainger's counsel contacted GSA to point out a discrepancy between the BPA's three-calendar-day delivery requirement and MSC's quotation providing that it could deliver orders within three business days after receipt of order. Subsequently, the contracting officer reviewed the BPA and the Memorandum of Agreements with the FRCs and discovered that the FRCs do not receive deliveries on weekends or federal holidays. AR 11. She therefore determined that the BPAs incorrectly stated the Government's delivery requirement in terms of calendar days. *Id.* The agency further found that "the distinction between three 'calendar' days and three 'business' days could significantly impact shipping costs, [which] likely impacted the BPA Holders' price quotations,[] includ[ing] shipping price." AR 569. GSA thus decided that it was necessary to take corrective action to modify the BPA to include the Government's actual delivery requirement. *Id.*; AR 11.

GSA cancelled MSC's BPA modifications on June 18, 2015 and announced that it would be taking corrective action due to a "flaw in the procurement." AR 554. GAO therefore dismissed Grainger's protest as

academic. AR 986. On July 2, 2015, MSC protested at GAO the decision to take corrective action, alleging that GSA's decision was improper because Grainger was not prejudiced by the misstated delivery requirement. AR 575.

On July 16, 2015, while MSC's GAO protest was still pending, GSA issued an amended RFQ that reflected a three-business-day delivery requirement for referral orders. AR 326. The instructions accompanying the amended RFQ provided that

> [n]o changes to your price quotation are anticipated. However, should your [Final Quotation Revisions ("FRQ")] include price changes, those changes will be evaluated only to the extent that they are supported by a clear demonstration that the change in offered price from your previous price quotation is directly related to the BPA amendment regarding shipping and delivery requirements or this RFQ amendment regarding the inventory and inspection requirements.

AR 329. The agency, in effect, was trying to minimize the potential for prejudice which might result from reopening the RFQ by limiting changes to those triggered by the error.

On July 30, 2015, Grainger protested the corrective action, arguing that, due to the passage of time, vendors should be allowed to update proposed products to reflect current availability and pricing. AR 620-21. Grainger submitted its revised quotation the next day, indicating that its list of Schedule 51V products had changed significantly since its initial quotation in March 2015, but that given the limitation imposed by the amended RFQ, those changes were not reflected in its revised quotation.

The contracting officer subsequently discovered that between April and July 2015, Grainger had, indeed, made numerous decreases to its Schedule 51V contract prices as well and had deleted a number of items from its Schedule 51V item list. AR 725; 1201-08. Accordingly, she determined that further corrective action was necessary to allow BPA holders to update their revised quotations based on changes to their Schedule 51V prices. AR 725. Without this corrective action, she determined, the revisions as they currently stood would "inadvertently result in an invalid price evaluation and would produce misleading results." Id. GSA therefore issued another amended RFQ, allowing BPA holders to update their revised quotations "to reflect any price

changes based on the amended BPA and RFQ shipping and delivery requirements, as well as any revisions necessitated by changes make to the BPA holders' underlying GSA Schedule Contract." AR 648. GAO thereupon dismissed Grainger's protest as academic. AR 988.

MSC subsequently filed a supplement to its then-pending protest with GAO, challenging GSA's second corrective action. MSC argued that the second corrective action was without reasonable basis and would result in competitive prejudice to MSC. AR 715-20. MSC and Grainger submitted their revised quotations on August 19, 2015, prior to resolution of the protest. In its revised quotation, MSC opted not to revise its prices. AR 1150.

On October 9, 2015, GAO denied MSC's protest. Regarding the first corrective action, GAO noted that, "where an agency discovers that a solicitation overstates its needs, the proper remedy generally is the revision of the solicitation to reflect the agency's actual needs," and found that it was "within the agency's discretion to decide there was a reasonable possibility that the flaw in the solicitation resulted in prejudice to Grainger." AR 983. With respect to the second corrective action, GAO also found that it was within the agency's discretion. AR 984.

MSC filed this protest on November 20, 2015. On December 3, 2015, we stayed the case pending an award decision by GSA regarding the revised quotations submitted on August 19, 2015. In February 2016, GSA determined that Grainger's quotation offered the best value to the government and awarded the BPA modifications to Grainger. We lifted the stay, and the parties filed their cross-motions for judgment on the administrative record.

DISCUSSION

Pursuant to the Tucker Act, this court has jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). MSC is an "interested party" because it is a prospective bidder "whose direct economic interest would be affected" by the award of the BPA modifications to Grainger. *Am. Fed'n of Gov't Emps., ALF-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

Our review is limited to the existing administrative record generated in connection with the procurement at issue. *See* RCFC 52.1. We review the administrative record pursuant to the standards set forth in section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (2012). 28 U.S.C. § 1491(b)(4). Thus, we may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). We note that, in the case at bar, much of the administrative record consists, in large measure, of explanations for corrective actions undertaken in response to and during the pendency of the parties' multiple GAO protests. Because the explanations of the corrective actions are thus inextricably linked to the GAO protests, we have no reservations about treating them as contemporaneous documents rather than as part of an after-the-fact narrative.

The protestor bears the burden of establishing that the agency's decision lacked a rational basis or was otherwise in violation of applicable law or regulation. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Additionally, plaintiff must show prejudice, meaning that, had it not been for the error in the procurement process, there is a reasonable likelihood that the challenger would have been awarded the contract. *Data Gen. Corp. v Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

Plaintiff asks this court to determine that both of GSA's corrective actions were arbitrary and capricious and requests that this court issue a permanent injunction requiring GSA to terminate the BPA modification awards to Grainger.

First, plaintiff argues that GSA's initial corrective action was unreasonable because there was no real possibility that Grainger or any other competitor was prejudiced by the BPA's misstatement of the delivery requirement. According to plaintiff, corrective action is unreasonable where the agency has not identified a clear defect in the procurement, when it is in response to a non-prejudicial error, or where it does not specifically target the identified defect in the procurement.

Plaintiff contends that the supposed error, MSC's noncompliance with the solicitation's three-calendar-day delivery requirement for referral orders, was not actually an error because there was not in fact a three-calendar-day

delivery requirement. While the BPA used language stating the requirement in those terms, the RFQ did not. Instead, the RFQ expressly stated that the vendor's "fill rate" for referral orders would be its percentage of on-time deliveries calculated in terms of business days. Moreover, the FRCs do not accept deliveries on weekends or holidays and therefore there was no basis for competitors to believe that the solicitation required delivery in three calendar days.

According to plaintiff, the record shows that GSA did not even attempt to investigate whether the difference between a three-business-day and a three-calendar-day delivery requirement had an impact on pricing. Plaintiff contends that it could not have had a meaningful impact because the requirement only applies to referral orders, which are a small portion of the overall cost of supplying items. Further, plaintiff argues that the record shows that Grainger was not prejudiced by the misstated requirement because it did not change its pricing at all in response to the amendment to the RFQ, and any subsequent changes were solely the result of changes to its underlying Schedule 51V pricing.

Plaintiff also challenges GSA's decision to take corrective action a second time by allowing Grainger and other vendors to make pricing changes. This was unreasonable, plaintiff argues, because it was not targeted at the concern that justified the initial corrective action. Plaintiff argues that any changes in the vendors' Schedule 51V pricing would automatically be incorporated during performance and thus it was unnecessary to allow pricing changes to the quotations. In addition, Grainger was given the opportunity for an unfair advantage by being told that its initial price was 23% higher than that of MSC.

Plaintiff also has an alternative argument directed at the award decision itself. It contends that the award was arbitrary and capricious for three reasons: (1) the agency should have realized that Grainger's manipulation of the market basket rendered the price evaluation methodology flawed; (2) Grainger's quotation is noncompliant with the delivery requirement; and (3) Grainger's quotation is noncompliant with the AbilityOne requirements.

As to the first reason, that Grainger's manipulation of the market basket rendered the price evaluation methodology flawed, plaintiff contends that the evaluated price figures based on the RFQ's market basket are intended to be representative prices. Most products available for sale through the vendors'

Schedule 51V catalog are not included in the market basket; the idea is that the market basket items will reasonably reflect the ultimate cost to the government. According to plaintiff, it should have been clear to GSA that Grainger manipulated the market basket pricing scheme by selectively reducing the prices of the highest costing items in its revised quotation, thus rendering the evaluation methodology flawed because it did not reasonably reflect the costs to the government.

In support of the second reason, that Grainger's quotation is noncompliant with the delivery requirement, plaintiff argues that Grainger's quotation is ambiguous as to whether it will meet the delivery requirement because Grainger's quotation refers to an erroneous requirement of five to seven day delivery. Because GSA clearly views the delivery requirement as material, plaintiff argues, the agency acted arbitrarily and capriciously in awarding the BPA modifications to Grainger on the basis of a noncompliant quotation.

For the third reason, plaintiff argues that Grainger's quotation is noncompliant with the AbilityOne requirements because it quoted at least nine items that are essentially the same products as those on the AbilityOne procurement list.

Lastly, plaintiff argues that it satisfies the other requirements for a permanent injunction  it would suffer irreparable harm in the form of loss of sales if a permanent injunction were not entered, the public interest favors issuing a permanent injunction, and the balance of hardships tips in its favor.

In response, defendant argues that the agency did not act unreasonably in initiating the first corrective action because MSC's quotation did not conform to the delivery requirement. Even if it did conform, defendant argues, the agency was within its rights in initiating the corrective action because it is undisputed that the original RFQ did not reflect its actual needs. Moreover, defendant contends, MSC offers no support for its argument that the delivery requirement was immaterial; rather, at the time, the agency had reason to believe that the changed requirement could have had a significant impact on vendors' proposed pricing.

As to the second corrective action, defendant argues that the agency's decision was rational given that the vendors' underlying Schedule 51V pricing had changed extensively. Moreover, defendant disagrees that this corrective

action resulted in any competitive advantage to Grainger because both parties were given the opportunity to change their pricing.

Defendant also disputes plaintiff's arguments for why the agency acted unreasonably in awarding the BPA modifications to Grainger. First, defendant argues that the contention that Grainger manipulated the pricing scheme is completely speculative. Next, defendant contends that Grainger's quote actually did comply with the delivery requirement  it stated that Grainger can provide 24-48 hour shipment times on referral orders, and next day pickup for on-site pickup referral orders. Lastly, defendant points out that MSC has failed to show that it was prejudiced by the inclusion of any essentially-the-same items as AbilityOne items in Grainger's market basket.

Intervenor's cross-motion makes much the same argument as defendant, but Grainger further seeks dismissal of plaintiff's challenge to the agency's price evaluation as untimely, arguing that it should have been challenged prior to the due date for receipt of proposals.[4]

### GSA's Decision to Take Corrective Action

We find that the agency was well within its rights in taking both corrective actions. As to the first, MSC is in a weak position to argue that it was prejudiced by the agency's decision to re-solicit. Its quotation could have been rejected as materially non-compliant with the delivery term. Instead, the agency determined that the use of three "business" days was sufficient. The problem, of course, was that Grainger and at least one other bidder offered to comply with the "calendar" day requirement. A discrepancy as significant as the delivery date is more than sufficient to warrant an amendment to the solicitation. *See* FAR 15.206(a) (2015); *see also EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 224-25 (2004) ("Amendments under this provision may also be appropriate 'to avoid award decisions not based on the agency's most current view of its needs.'").

We disagree with MSC's contention that the agency should have undertaken a careful forensic inquiry into whether the mistake it made in stating the delivery requirement could have had enough impact on Grainger's

---

[4] Grainger's motion to dismiss additionally contends that plaintiff's protest of Grainger's AbilityOne compliance is an unprotestable matter of contract administration.

pricing to make up the difference in the two bidders' pricing. The agency considered the problem and, not unreasonably, found that "the distinction between three 'calendar' days and three 'business' days could significantly impact shipping costs, [which] likely impacted the BPA Holders' price quotations,[] includ[ing] shipping price."[5] AR 569. It was not required to go further and speculate from its own knowledge base how the vendors would have reacted to a different RFQ. It is important to note, in any event, that the agency initially limited the vendors to submitting new prices only to the extent they could demonstrate prejudice, i.e., that the original bid factored in tighter delivery times. The way the corrective action was crafted initially thus accounts for the very concern which plaintiff now asserts. In fact, Grainger's response to the first corrective action, while made under protest, did not result in altered pricing.

Validity of the second corrective action is closely linked to the first. If the delay triggered by the first corrective action was understandable, as we find that it was, the factual groundwork was laid for Grainger's request for the decision to reopen pricing more broadly, due to the hundreds of thousands of changes to its Schedule 51V pricing. The agency, in doing price comparisons, had to cope with four moving targets: both Grainger's and MSC's FSS price list, the items of overlap within the "market basket," and the list of AbilityOne products. The first two and the last item it had no control over, and the agency knew that all three routinely changed over time. The third variable, the market basket items, it had only limited control over. It did not know which items both bidders would provide price quotations for. The net result is that comparison of quoted prices inevitably ran the risk of some degree of imprecision. But what was known for certain was that the longer the lapse of time after the quotes were initially received (March 2015), the more likelihood that price comparisons would not accurately reflect actual costs in the future. The agency was confronted in August 2015 with Grainger's evidence of its changes to hundreds of thousands of prices and the deletion of 53,000 items. Concern

---

[5] The considerations brought to bear when it is the agency's own procurement needs that prompt corrective action are fundamentally different from a situation in which a competitor alleges that corrective action is warranted by potential prejudice to it. Thus the cases plaintiff cites are not apt. *See*, *e.g.*, *Amazon Web Servs., Inc. v. United States*, 113 Fed. Cl. 102, 111 (2013). Nor is this a circumstance in which there is a complete failure to offer a rationale for taking corrective action. *See WHR Group, Inc. v. United States*, 115 Fed. Cl. 386, 398 (2014).

about whether the prices were so stale that they would not afford a proper price comparison and thus the best value to the government was not irrational.

The fact that the delay associated with the first corrective action turned out to be unnecessary, while ironic under the circumstances, is irrelevant. The contracting officer cannot be faulted for not consulting a crystal ball. Once the first corrective action had become part of the procurement history, it was not irrational to permit comprehensive price re-submissions in order to protect the government's interests. Accordingly, we deny plaintiff's challenge to the validity of either corrective action.

### GSA's Decision to Award the BPA Modifications to Grainger

We come now to MSC's separate contention that the agency's decision to award the BPA modifications to Grainger was arbitrary and capricious. As to the first element in this line of argument that the agency should have deduced that Grainger was manipulating the procurement by targeting price changes on its FSS price schedule to market basket items  counsel conceded at oral argument that there is little daylight between this argument and its challenges to the corrective actions. In effect, the argument is that, even if the second corrective action was warranted in principle, as applied, it should have been obvious that the agency was being duped. As Grainger argues in its motion to dismiss, however, the opportunity for such manipulation, if it existed, should have been apparent before MSC submitted its final revised quotation, and, in any event, was an opportunity that MSC could have taken advantage of. The evaluation methodology has remained unchanged since the initial RFQ. The "as applied" challenge comes too late. A contractor who has the opportunity to object to the terms of a solicitation but fails to do so prior to the close of the bidding process waives its right to later object in this court. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

In any event, we do not find support for the argument that Grainger manipulated the market basket by selectively reducing the prices of its highest priced items. While some of the market basket items were repriced, under the circumstances, that is not surprising. During April and July 2015, Grainger deleted approximately 53,000 products from its catalog, and reduced prices for approximately 700,000 items. While the 548 items in the common market basket were known to the bidders, they could not be certain which ones would be common to all bidders and thus made the point of price comparison.

Next, we disagree that Grainger's quotation was noncompliant with the delivery requirement. Although Grainger's proposal mentions its "ability to meet the 5 to 7 day delivery requirement," *id*. at 469, this is plainly an irrelevant mistake. Elsewhere it clearly indicated its intent to meet the RFQ's actual requirement that orders be acknowledged within 24 hours of receipt and shipped within one business day of acknowledgment using three-business-day delivery. *Id*. at 12; 159-162. Grainger's proposal contained numerous indications that it intended to deliver referral orders within three business days. *See* AR 451 (referencing one day delivery ability for FRCSE); 452 (referencing same and next day delivery ability for FRCE);453 (referencing two day delivery ability for FRCMA); 454 (referencing same and next day delivery ability for FRCSW); 459 (indicating next day pickup for referral orders).

Finally, we believe that Grainger's proposal complied with the solicitation's AbilityOne requirements. The BPAs simply stated that the vendors were to "ensure that no item when is essentially the same as an AbilityOne item *be sold* to a Government customer." AR 1053 (emphasis added). Thus the requirement refers to the items sold, not the items quoted. Nowhere does the solicitation prohibit a vendor from quoting items that are essentially the same as AbilityOne items. This is particularly understandable in light of the fact that the vendors' quotations were simply meant to be a representative sample of the cost to the government rather than an exact list of items to be sold. Accordingly, there was nothing unreasonable about the agency's decision to award the BPA modifications to a vendor, even if it quoted items essentially the same as AbilityOne items. The AbilityOne list changes over time, and whether an item offered by the vendors here was truly the same as one on the AbilityOne list would be nuanced. Requiring that purge prior to actual purchases would be a waste of time.

CONCLUSION

Because we find that the agency's decisions to take corrective action and to award the BPA modifications to Grainger were reasonable, we deny plaintiff's motion for judgment on the administrative record, and we grant defendant's and intervenor's motion for judgment on the administrative record.

Grainger's motion to dismiss is denied as moot.[6] The clerk is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[6] While the motion arguably implicates jurisdictional considerations, even if the motion to dismiss were granted, not all of plaintiff's arguments would be dismissed. Moreover, as we explain in the text, it is not clear that the argument concerning the agency's failure to police Grainger's alleged manipulation of it opportunity to re-price its FSS list is really distinct from its other arguments, which were timely preserved.  Even if MSC's arguments are more properly deemed to fail a jurisdictional test, in the context of a bid protest, we assume Grainger has no objection to MSC being hung for a sheep as opposed to a lamb.